**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CRIMINAL NO.  1:06CR36**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **O R D E R** |
| | ) | |
| | ) | |
| **JOSE MIGUEL DIAZ-VALERIO** | ) | |
| ──────────────────────── | ) | |

**THIS MATTER** came on for hearing before the Court on the

Defendant's motion to suppress on June 30, 2006.  At the conclusion of

the hearing, the undersigned denied the Defendant's motion.  The reasons

for that ruling are set forth herein.


## I.  EVIDENCE RECEIVED DURING THE HEARING

On February 9, 2006, Cleveland County  Sheriff John McIntyre was

on duty when, at about 9:00 a.m., he saw the Defendant drive past him in a

white Volvo at 65 miles per hour.  The Defendant turned to look in the

direction of the Deputy and then quickly turned his head back and locked

his arms on the steering wheel.  The Deputy turned his car and followed

the Defendant partially because he was speeding and also because of his reaction when he saw the Deputy. After about two-tenths of a mile, the Deputy turned on his blue lights at which time the Defendant pulled off the road in a safe manner. Upon request, the Defendant provided the Deputy with his license and registration, which the Deputy found were in order. However, when the Deputy approached the car, he noticed a strong odor of air freshener. In the experience of Deputy McIntyre, who is a canine officer, drug dealers use air fresheners to mask the odor of controlled substances from dogs. The Defendant said that he had just come from a mall where he had been selling clothes for a friend, but there was no evidence of clothing or boxes in the car. When the Deputy asked the name of that person, the Defendant produced a business card for a mechanic. Because of all of the above, the Deputy determined to call for back up officers when he decided to write the Defendant a warning ticket.

When defense counsel questioned Deputy McIntyre as to whether it was clear to him that the Defendant was Hispanic, the Deputy testified that as the Defendant passed him, he would have guessed that the Defendant was Hispanic but that he could also have been a Caucasian with a tan. The Deputy also testified that the Defendant understood English and did

not exhibit any trouble conversing with him.  After the Defendant produced a valid license and registration, the Deputy told him he was free to go.  The Deputy then asked the Defendant if he could search the car and the Defendant responded, "Sure, you check."  The Deputy noticed that the ceiling of the car was not normal and appeared to be dropped in order to house a hidden compartment.  Using a drill and a screwdriver, the Deputy opened the compartment which had a metal door held closed with bolts. The Deputy, who had been joined by the back-up officers by that time, unscrewed the bolts, opened the compartment, and found packages of methamphetamine.

During the suppression hearing, the officer who transported the Defendant to Court the day of the hearing, testified that the Defendant spoke English and had no difficulty conversing in English or answering questions in English.  In fact, during the suppression hearing, defense counsel called the Defendant to the witness stand and he answered each question posed with an answer in English until his attorney suggested that it might be better if he spoke in Spanish.  The Defendant also testified that while he did not completely understand Deputy McIntyre's request in English to search his car, he did understand the Deputy's gesture to mean

a request to do so.  He also understood when the Deputy returned his driver's license and registration that he had been giving a warning but was free to leave.  When the Deputy asked if he could ask one more question, the Defendant understood him.  When the Deputy asked if the Defendant had any guns in the car, the Defendant understood him, gestured toward the car and said, "Check."  When the Deputy asked if the Defendant had any drugs in the car, the Defendant understood him and said, "Check." When the Deputy asked the Defendant if he could search the car, the Defendant understood him and said, "Sure, check."  The Defendant also testified, in response to a question asked by his attorney, that when he pointed at the car, he was inviting the Deputy to search his car.

## II.  DISCUSSION

Defense counsel stated during the hearing that in view of the Defendant's admission that he consented to the search of the car, the only issue for resolution was the legality of the initial stop and the extent thereof.  Counsel argued that the Deputy had conducted an "ethnic profiling" of sorts in determining to stop an individual who appeared to be

Hispanic[1] and that the "dismantling" of the automobile was beyond the

scope of the consent.

> Turning to the automobile search, [Defendant] does not deny
> that after [Deputy McIntyre] stopped him, he gave [the Deputy]
> consent to search the automobile.  He argues, rather, that the
> stop was motivated by a[n] [ethnic]-based drug courier profile[.]
> [This] contention[ ] [is] without merit.  [Deputy McIntyre's]
> motive for stopping an automobile that was violating traffic laws
> is irrelevant to the legitimacy of the stop under a Fourth
> Amendment analysis.

*United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996) (citing *Whren*

*v. United States*, 517 U.S. 806 (1996)).  Indeed, even if the Deputy had

admitted that his reasons for stopping the Defendant were pretextual, once

he observed the Defendant speeding and noticed his unusual behavior,

probable cause arose for the traffic stop.  *United States v. Foreman*, 369

F.3d 776, 787 n.3 (4th Cir. 2004).  Thus, the issue of ethnic profiling is

moot.

> [Defendant] argues further that the scope of his consent did not
> include breaking open secret compartments and the police did
> not have probable cause for such a search.  Even though [the
> Defendant gave consent to the search, the Court] need not
> decide whether a consent to search authorizes breaking into a
> secret compartment.  The officers in this case had probable

---

[1]It is somewhat ironic that defense counsel also argued that her client would have been unable to understand Deputy McIntyre due to his speaking "Southern English."

cause to believe that the car [the Defendant] had been driving contained contraband and, therefore, were justified in searching it without a warrant under the well-established "automobile exception."

***Bullock, supra.*** In short, the totality of the circumstances, the presence of air fresheners (*Foreman, supra*), lack of excess clothing in the car, and the obvious nature of alterations to the ceiling of the car, provided the officers with probable cause to conduct the search. ***Id.; accord, Foreman, supra.***

Moreover, the officers were not required to have had probable cause under these circumstances.

The *Terry* [v. Ohio, 392 U.S. 1 (1968)] reasonable suspicion standard requires an officer to have a reasonable suspicion that criminal activity is afoot before he may conduct a brief investigatory stop of a person, or continue to seize a person following the conclusion of the purposes of a valid stop, see*, e.g., United States v. Rusher*, 966 F.2d 868, 876-77 (4th Cir. 1992) (holding that, during a routine traffic stop, the officer may request a driver's license and vehicle registration, run a computer check, and issue a citation, but that "[a] further detention for questioning is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime."). The standard [of reasonable suspicion] "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow v. Illinois*, 528 U.S. 119, 122-24 (2000). However, the *Terry* reasonable suspicion standard does require "a minimal level of objective justification" for the police action. *Id*. "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id.* (quoting *Terry*, 392 U.S. at 27). [The Fourth Circuit has] said that the *Terry* reasonable suspicion

standard is "a commonsensical proposition," and that "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). The reasonable suspicion determination does not depend upon any one factor, but on the totality of the circumstances. . . . The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion.

***United States v. Brugal*, 209 F.3d 353, 356, 358-59 (4th Cir. 2000).**

Such is the case here.

## III.  ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion to suppress is hereby **DENIED.**

Signed: July 13, 2006

Lacy H. Thornburg
United States District Judge